## IN THE UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF ARKANSAS
### JONESBORO DIVISION

IN RE:     **CHARLES ALAN BURNETT and**       Case No: 03:09-bk-13432
             **DENISE BURNETT, Debtors**           CHAPTER 13

## MEMORANDUM OPINION AND ORDER GRANTING MOTION TO DISGORGE FEES AND IMPOSING SANCTIONS ON CHAD R. OLDHAM

Now before the Court is the *United States Trustee's Motion to Examine Fees Paid to Attorney Pursuant to 11 U.S.C. § 329(b)* ("**Motion to Disgorge Fees**") (docket #88), filed August 23, 2010, and the Court's *Order to Appear and Show Cause* ("**Order to Show Cause**") (docket #99) entered against Chad R. Oldham on September 28, 2010.

### INTRODUCTION

The actions at the heart of this Motion to Disgorge Fees and Order to Show Cause were initially brought to light following two letters that the Debtors sent to Mr. Oldham. Within those letters, the Debtors asserted that Mr. Oldham failed to timely file their bankruptcy case in order to prevent a foreclosure sale on their home, that Mr. Oldham had not been involved in their case or provided them with legal advice, and that Mr. Oldham misrepresented that the Debtors had wanted to surrender their home. Subsequently, the Debtors sent a copy of those letters, along with Mr. Oldham's response, to the United States Trustee's Office. The U.S. Trustee's Office then filed the Motion to Disgorge Fees. The Motion to Disgorge Fees alleges that the Oldham Law Firm failed to provide adequate

representation to the Debtors, and violated the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and the Local Rules and General Orders of this Court.

After reviewing the Motion to Disgorge Fees and the docket in this case, the Court issued an Order to Show Cause against Mr. Oldham.[1]  Within the Order to Show Cause, the Court provided Mr. Oldham with notice of the allegations and explained the Court's authority to enter sanctions under Rule 9011(c), 11 U.S.C. § 105, and the Court's inherent power to sanction those appearing before it.  The Court also directed Mr. Oldham "to appear before this Court fully prepared to present all evidence, of whatsoever nature, that he deems necessary and appropriate for the Court's consideration."

The Court heard the Motion to Disgorge Fees and Order to Show Cause in a hearing on January 6, 2011.  Chad R. Oldham appeared, *pro se*.  The Debtors were present at the hearing and were represented by their counsel, Michael DeLoache.[2]  The U.S. Trustee appeared through her attorney, Patricia Stanley.  At the conclusion of the hearing, the Court granted the Motion to Disgorge Fees and found that Mr. Oldham's conduct warranted an entry of sanctions against him, but took the issue of what sanctions to enter under advisement.

The facts of this case can be summarized as follows:  The Debtors in this case both

---

[1]  On the same date, the Court entered an *Order to Appear and Show Cause* (docket #99) against Mr. Oldham in Case No. 03:09-bk-13882 based on similar allegations made in that case.

[2]  The law firm of Crawley & DeLoache was substituted as counsel for the Debtors on July 13, 2009.

worked full time; they lived within their means in a home they loved.  The Debtors fell behind on their mortgage payments, but were attempting to work with the mortgage company to pay that outstanding amount in full.  At that time, the Debtors were not behind on any other financial obligations, and had a $6,000 tax refund in their bank account, which they intended to use in its entirety to repay the mortgage arrearage.  However, when they received a foreclosure notice from the mortgage company, they knew they needed legal advice.  With the foreclosure notice in hand, the Debtors went to Mr. Oldham's law firm.  As a direct result of Mr. Oldham's failure to provide legal services: the debtors lost their home; got behind on car payments; used their $6,000 tax refund for purposes other than paying their mortgage arrearage; filed a bankruptcy; and ultimately, ended up living in a borrowed camper in an RV park.  Mr. Oldham failed to meet with his clients prior to filing the bankruptcy case, failed to provide them with legal advice, and ignored them in spite of his first-hand knowledge of the harm he had inflicted on them.  Mr. Oldham acted purposefully to conceal his errors and shield himself from liability by removing documents from the Debtors' file, and by making misleading statements in his letters to the Debtors and in his sworn testimony before this Court .

For the reasons stated in open Court, and on the following findings of fact and conclusions of law,[3] the Court orders Mr. Oldham to disgorge all attorney fees paid to him

---

[3] To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such; to the extent that any conclusion of law is construed as a finding of fact, it is adopted as such.

in this case, and suspends Mr. Oldham from appearing before, or filing pleadings and other documents in, the United States Bankruptcy Courts until such time that the Arkansas Supreme Court's Committee on Professional Conduct has reviewed this matter and made its determination.

## BACKGROUND AND EVIDENCE

### The Debtors and Chad R. Oldham.

Charles and Denise Burnett (the "**Debtors**") filed a petition for relief under Chapter 13 of the Bankruptcy Code on May 14, 2009. The Debtors are both employed. Denise Burnett has maintained a stable income as a registered nurse for more than 25 years. Charles Burnett is an over the road truck driver and, although his income varies from $250 to $600 per week, his employment is continuous and relatively consistent. The Debtors' Schedule I states that their combined net monthly income is $2,662.44, and an Amended Schedule J states that their average monthly expenses total $1,370, for a difference of $1,292.44.[4]

The Debtors were represented in their bankruptcy case by Chad R. Oldham. Mr. Oldham is an attorney with the Oldham Law Firm, located in Jonesboro, Arkansas.[5] The Debtors hired Mr. Oldham to prepare, file, and represent them in a bankruptcy case on March

---

[4] This expense calculation does not include the Debtors' mortgage payment, which Mrs. Burnett stated to have been approximately $900 per month. If the Debtors' Schedule J had included an amount for their ongoing mortgage payment, they would have a net monthly income of $392.44.

[5] Chad R. Oldham is the only attorney at the Oldham Law Firm who practices bankruptcy before this Court. Mr. Oldham is the figurehead of the law firm and, as far as this Court is aware, is the firm's only attorney.

25, 2009, after learning that their home had been placed in foreclosure.  The Debtors case was not filed until May 14, 2009.

### The Testimony of Denise Burnett.

At the hearing on this matter, Mrs. Burnett testified that the Debtors fell behind on their home mortgage when their loan was transferred from Regions Mortgage to Everhome Mortgage Company ("**Everhome**").[6]  Mrs. Burnett explained that they had missed several payments because they were not notified when the loan was transferred to Everhome, and by the time they were notified the amount owed had "snowballed" because of the additional fees and costs included in the deficient payment amount.  Mrs. Burnett testified that they were in the process of trying to repay this amount when they received a letter, dated March 9, 2009, advising them that their home was in foreclosure and was to be sold on April 30, 2009.  After receiving this notice, the Burnetts decided to seek legal advice.  Mrs. Burnett explained that the Debtors decided to make an appointment with the Oldham Law Firm after seeing an advertisement for the firm's bankruptcy practice.  On March 25, 2009, the Debtors went to the Oldham Law Firm for a scheduled legal consultation.

When the Debtors arrived for their meeting with the Oldham Law Firm, they were directed to speak with Ms. Julia Gray, one of the firm's paralegals.  During the meeting, the Debtors informed Ms. Gray of the foreclosure, and provided her with a copy of the March 9, 2009 foreclosure notice (U.S. Trustee Ex. #5).  The front page of this letter stated in bold

---

[6]  The documents filed by Everhome in this case state that Everhome is the servicing agent for Everbank, who is the current holder of the note.

type: "**The Property is scheduled to be sold at a foreclosure sale.  Please review the enclosed statutory Notice of Default and Intention to Sell and familiarize yourself with the details of the sale.**"  On the reverse side of this letter was a notice explaining that the sale was to take place on April 30, 2009, at 11:00 a.m., and providing a warning in bold, capitalized type that "**YOU MAY LOSE YOUR PROPERTY IF YOU DO NOT TAKE IMMEDIATE ACTION.**"  Mrs. Burnett testified that she specifically pointed out the April 30, 2009 sale date to Ms. Gray.  Mrs. Burnett testified that during the consultation Ms. Gray advised them that the only way to save their home would be to file a Chapter 13 bankruptcy.

Other than their home, the only secured debt owed by the Debtors was for a 2002 Nissan Maxima.  Mrs. Burnett provided testimony that the Debtors were current on their payments on this vehicle at the time of their initial consultation, but that Mr. Oldham's paralegal advised them to stop making the payment and allow it to fall into arrears.

Mrs. Burnett also stated that the Debtors informed Ms. Gray that they were holding a $6,000 tax refund in their bank account, and that they hoped that the funds could be used to repay the amount they owed to Everhome.  During the hearing, Mrs. Burnett was asked whether the Debtors intended to use the funds to repay the mortgage arrears, to which Mrs. Burnett responded, "[w]e were going to use all of it. . . . [I]f they could have negotiated with Everhome, and not filed bankruptcy – you know, if someone could have talked to Everhome to help us plan out a payment plan, we wouldn't have filed bankruptcy."  Mrs. Burnett testified that instead of using the funds to repay the mortgage arrearage, they were advised

6

to remove the $6,000 tax refund from their bank account.

Mrs. Burnett testified that the Debtors were told that it would cost $800 in order for Mr. Oldham to file the bankruptcy case. On the day of the initial consultation, March 25, 2009, the Debtors paid $200 to retain the Oldham Law Firm, and returned the next day to pay an additional $600. Additionally, Mrs. Burnett stated that within one week of the consultation, approximately April 1, 2009, the Debtors provided all of the requested documentation. The Debtors also removed the $6,000 from their bank account. They used part of the money to pay expenses for a trip to visit Mrs. Burnett's brother in Virginia, and the remaining amount was divided into gifts for their two daughters.

Mrs. Burnett testified that throughout the month of April, the Debtors tried to call the Oldham Law Firm on several occasions in an attempt to monitor the progress of their case, but that their calls were never returned. After deciding that the firm could not be reached by phone, Mrs. Burnett made an appointment for an office consultation. At that appointment, she was directed to speak with Amy Forbes, a paralegal for the firm. At first, Ms. Forbes informed Mrs. Burnett that the Debtors case had not been filed because they had not turned in all of their paperwork. Mrs. Burnett testified that Ms. Forbes was not looking at the Debtors' file, and that she pointed this fact out to Mrs. Forbes. Ms. Forbes then went to search for the Debtors' file, and when she returned, told Mrs. Burnett that everything with the Debtors' file was fine.

In early May, the Debtors received a letter from Wilson & Associates advising them

that the foreclosure sale had taken place, and that they were being evicted from their home.

During the hearing on this matter, Mrs. Burnett provided the following account of that event:

> Mrs. Burnett:  I got a letter from [Everhome], probably the first week in May, telling us we had to move out of our house in three days.
>
> U.S. Trustee:  Okay.  What did you do after receiving that letter?
>
> Mrs. Burnett:  Well, I lost my mind.  And I went directly up to Mr. Oldham's office with the letter.  And he happened to be standing in the front talking to someone – and I assumed it was him, because I had not seen him before, but – and I showed him the letter.  And he said something like, "well, how did this happen?  Are you our client?"  And I was like – I was very upset and crying – and I was like, "yes, yes, I'm your client."  So he – they directed me to go back to the paralegal's office.

Mrs. Burnett testified that she did not have any further conversations with Mr. Oldham that day.

On May 14, 2009, after learning from Mrs. Burnett that the home had been sold in the foreclosure sale, the Oldham Law Firm filed the Debtors' bankruptcy case.  Mrs. Burnett testified that the next time they heard from the Oldham Law Firm was on June 18, 2009, the date of their 341(a) meeting.  On the morning of the 341(a) meeting, the Debtors received a call from the Oldham Law Firm asking them to come into the office for a meeting with Mr. Oldham.  Mrs. Burnett testified that this was the Debtors' first meeting with Mr. Oldham.  Mrs. Burnett stated that it appeared to her from the way Mr. Oldham was reviewing the documents in the file and the questions he was asking that this was the first time he had looked at their file.  Mrs. Burnett explained that this meeting ended with Mr. Oldham telling them that their file needed some work, but that he did not tell them what needed to be done.

8

Approximately one week after the June 18, 2009 meeting, the Debtors received a call from Mr. Oldham's paralegal asking them to return to the office for another meeting. At this meeting, the Debtors once again met with Mr. Oldham's paralegal, Ms. Gray. Mrs. Burnett provided the following testimony describing this meeting:

> I sat down with Julia and she looked at me and said, "you're not going to be able to keep your house." And I got very upset. And I'm sure I raised my voice. And I was like, you know, "what do you mean that we can't keep our house? . . . I told you, you had all these papers." And I had this – I opened my file to this letter from Wilson & Associates, and I said, you know, "we went over this together. It said right here, on April 30[th] they were going to sell our house. You and I talked about this." And she said, "well, you just need to look at this like this is something good, you're out from under that house now, and you can cancel your Chapter 13 and everything will be all right." And I said, "well, we don't have a place to live." And she said, "well, we know lots of people with rent houses." I'll never forget that conversation.

Mrs. Burnett explained that at this point they began looking for new legal representation to try to help them save their home. On July 3, 2009, the Debtors made an appointment with the law firm of Crawley & DeLoache, who requested that they obtain a copy of their file from Mr. Oldham. That same day, July 3, 2009, Mrs. Burnett attempted to obtain a copy of the Debtors' file from Mr. Oldham. Mrs. Burnett testified that she went to the law office and requested a copy of the file, but was told by Mr. Oldham's paralegal, Amy Forbes, that they could not get her a copy of the file that day because the office was going to close early for the holiday weekend. Ms. Forbes instructed Mrs. Burnett not to return for the file until after business hours the following Monday, July 6, 2009. Mrs. Burnett returned the following Monday at five o'clock. Mrs. Burnett testified that when she arrived there was

9

an envelope waiting for her at the front desk.  Mrs. Burnett explained that the envelope contained only a few documents and did not contain any of the letters regarding the foreclosure and sale of the home.  Mrs. Burnett testified that while she was standing at the front desk, Mr. Oldham came out of an office to get a client.  Mrs. Burnett explained that when she saw Mr. Oldham, she asked him, "where [are] all of our papers?  All of our stuff is gone," and that Mr. Oldham replied, "I don't know, I don't have any knowledge of that," and that Mr. Oldham then turned around and walked off.

The Burnetts were eventually evicted from their home.  After leaving their home, they were forced to borrow a camper-trailer and move into an RV park.  The Burnetts lived in the camper-trailer for approximately five months, then moved into an apartment, and in December of 2010 moved into a rent house.[7]

### The Motion for Relief Filed by Everhome Mortgage.

On June 9, 2009, Everhome filed a *Motion for Relief from Stay* ("**Motion for Relief**") (docket #15) and an *Objection to Confirmation of Plan* ("**Objection to Confirmation**") (docket #16).  The Court's docket reflects that notice of these filings was sent to multiple

---

[7] The U.S. Trustee provided the Court with a letter it had received from the Debtors, dated July 24, 2009, detailing their experiences with Mr. Oldham (U.S. Trustee Ex. #4).  Because the account of the facts in the July 24, 2009 letter closely parallels Mrs. Burnett's testimony, it would be of no additional benefit for the Court to describe the contents of that letter here. Nonetheless, the Court does incorporate and rely upon the letter in its entirety as a part of the factual basis for this Opinion.

email addresses for Mr. Oldham.[8]  In those filings, Everhome stated that the Debtors'

property had been sold on April 30, 2009 (prior to the filing of the Debtors' bankruptcy), that

the Debtors' interest in the property was terminated at that time, that the property was not

property of the estate, and that Everhome was requesting relief so that it could enforce its

right to possession of the property.  A hearing on these filings was scheduled for June 25,

2009.  On June 24, 2009, one day prior to the hearing, the attorney for Everhome notified the

Court that the parties had settled the Motion for Relief and instructed the Court to remove

the matter from its docket.  On June 25, 2009, Everhome sent a proposed order on their

settlement agreement to Mr. Oldham for his signature.  In that communication, Everhome

notified Mr. Oldham that in accordance with Local Rule 9019-1,[9] he had 10 days (until July

6, 2009) to object to the proposed order on the basis that it did not comply with their

agreement, or otherwise, Everhome would submit the proposed order to the Court.

On July 8, 2009, after the 10-day period to object to the proposed order had expired,

---

[8]  The following are the recipient email addresses provided on the certificate of electronic notification: coldham@oldhamlawfirm.com, julia@oldhamlawfirm.com, amy@oldhamlaw firm.com, inspiredjg@yahoo.com.

[9]  At the time of the decision on the Motion for Relief, Local Bankruptcy Rule 9019-1(c) stated:

> A party submitting a Consent Order to the Court shall forward a copy of the proposed order to the opposing attorney who shall have ten (10) days from the mailing or transmission of such order in which to object to the form or content of the order.  Upon obtaining the signature(s), counsel should promptly submit the order to the Court.  If opposing counsel does not respond in ten (10) days, the order is considered to be a Consent Order and the party preparing the order may submit it to the Court.

a paralegal for the Oldham Law Firm sent the following email to the Courtroom Deputy for this Court:

> Chad has asked that I email you regarding the above referenced bankruptcy case file. There was an Order from Wilson & Associates (Erika L. Brock) in this case presented to Mr. Oldham regarding the homestead property of the debtors. I have the Order in my file and am not sure as to if the Original had been sent back to Ms. Brock for proper filing. Regardless, as of today we have issues that have arisen from the creditor, Everhome Mortgage. We would like to ask that if this Order is in your presence could you please not proceed with the filing of said Order and set this for hearing on the August 27, 2009 docket. I apologize for any inconvenience this may have caused your office.

The Court responded, through a return email, that Mr. Oldham would need to file a motion[10] requesting that the matter be reset for hearing and explaining why the settlement agreement reached was no longer valid. No further filings or communications were received from Mr. Oldham on this matter.

On July 13, 2009, the law firm of Crawley & DeLoache was substituted as counsel for the Debtors. On July 22, 2009, Crawley & DeLoache filed a response to the Motion for Relief, which argued that the foreclosure sale was unenforceable and void. On July 28, 2009, Everhome filed a *Motion to Strike Response and Amended Response Filed by Debtors, or in the Alternative, Motion for Summary Judgment* ("**Motion to Strike Response**") (docket #36), in which Everhome asserted that the response filed by Crawley & DeLoache could not be heard because the parties had already reached a settlement agreement, and that settlement

---

[10] The Court notes, as it did in the Order Striking Response, that a document received in the form of a fax or email does not satisfy the electronic filing requirement for filing pleadings in this Court. *In re Haney*, 4:98-bk-41169 (Bankr. E.D. Ark July 23, 2008).

agreement had been properly submitted to Mr. Oldham for his approval, and that Mr. Oldham had indicated his approval (via Local Rule 9019-1) by failing to object to the agreement. The Court agreed with Everhome. On July 31, 2009, the Court entered an *Order Granting Motion to Strike Response and Amended Response and Directing Entry of Order Granting Motion for Relief from Stay Nunc Pro Tunc* ("**Order Striking Response**") (docket #38), and on August 10, 2009, the Court entered an *Order Granting Motion For Relief From Stay* ("**Order Granting Relief**") (docket #46). Within the Order Striking Response, the Court specifically noted in regard to the email received from Mr. Oldham's paralegal, "the Debtors' use of email to communicate a substantive matter raises concerns regarding the lawyer's professional obligation to his client and the Court."

## The Testimony of Chad R. Oldham.

The account of the facts provided by Mrs. Burnett's testimony were almost entirely uncontroverted by Mr. Oldham. In fact, Mr. Oldham began his testimony by giving credit to Mrs. Burnett's account of the facts, and acknowledging that he was responsible for failing to file the Debtors' case prior to the foreclosure sale:

> I'm going to say that I think, for the most part, Ms. Burnett's recount of her interaction with our firm and the result are accurate. The only distinctions that I might – and that I personally can speak to and recall, are that I personally recall visiting with Mrs. Burnett on two occasions. I don't recall those specific dates, and unfortunately our file doesn't note the dates that I personally visited with Mrs. Burnett. Our file does note and we acknowledge and agree that we were retained on March 25th, 2009. We were provided with documentation from Wilson & Associates, dated March 11th, 2009, which I have a copy of here today, which is a reinstatement form which indicates that the Burnetts were approximately $8,400 dollars in arrears – actually, about

$6,400 dollars in arrears, $2,000 dollars in late fees and attorneys' fees and the like. But nonetheless, we were aware that they were in a foreclosure situation – our firm was aware that they were in a foreclosure situation, and we did not timely file a bankruptcy, Chapter 13, in order to stay the foreclosure proceeding. And no doubt that we possibly have some – or have some responsibility for that.

Later in his testimony, Mr. Oldham apologized to the Debtors for his failure to provide them with adequate representation:

I would like to take this opportunity to apologize to Mr. and Mrs. Burnett. I don't think our firm provided the best counsel possible. I don't think that we provided the counsel that they deserved and that they thought they were getting. There are a number of reasons why that takes place, but as attorney and counsel, I bear that responsibility. I can tell you that there was a staff member that was having some problems, that we were overwhelmed; as this Court well knows what was going on in 2009, we as bankruptcy attorneys became overwhelmed, overloaded. I didn't see to it that my staff had all the support that they needed. And as a result of that, we are here today.

Mr. Oldham added to the account of the facts on only a few points. First, Mr. Oldham testified that he met with the Debtors on two separate occasions, and that in the first of those two meetings the Debtors had instructed him to surrender the home to the mortgage company. Mr. Oldham explained:

My conversations that I specifically and vividly recall with Mrs. Burnett in the ensuing time period are that – the two conversations were that they initially – Mrs. Burnett initially indicated that they were going to let the house go. They said fine, they would let the house go. They noted some particular problems with the home. My file contains some information with regards to insurance claims and damage involving the home. So there was a basis for them potentially wanting to surrender the home.

According to Mr. Oldham's testimony, it was only after the Debtors had been out to look at the rental properties that they changed their minds and wanted to retain the home.

14

Second, Mr. Oldham added that on May 15, 2009, the day after the bankruptcy was filed, he had sent a letter to Wilson & Associates in an attempt to negotiate a repayment agreement.

Third, Mr. Oldham pointed out that he was unaware of anything to do with the $6,000 tax refund prior to these proceedings. Mr. Oldham's testimony on this point was that:

> I can't imagine why any such counsel would have been given in this case. There would be no reason aside from the fact that that just wouldn't be sound counsel. The debtors in this case possessed sufficient statutory exemptions to protect said amount. I can't imagine why it wouldn't be applied to indebtedness otherwise, because they certainly could have. But I'm not familiar with that and I can't speak to that.

When asked by the Court whether Ms. Gray was removed from her position because of the events in this case, Mr. Oldham replied:

> MR. OLDHAM: Yes, Ma'am – well, she separated from service about July the 1st or August the 1st of 2009. Yes, Your Honor. She returned to work for me in a receptionist capacity some time in the Spring of 2010. I think she was absent about six months from the firm.
>
> THE COURT: What was the circumstance of her separating from your work?
>
> MR. OLDHAM: She was having some – some physical and emotional personal issues. She had a couple of children, [and was] dealing with family, domestic relation issues. And it was – she could no longer devote her time and attention to work at our firm.
>
> THE COURT: Okay. So it wasn't as a result of letters your office received from Mrs. Burnett?
>
> MR. OLDHAM: No. In fact, I don't think we received a letter from Ms. Burnett until after her initial separation, if I recall.
> . . .

THE COURT: I am assuming from what you said that she did not have the capacity to work anymore and that she had to not work anymore. I am assuming from what you said that you did not confront her with the allegations, because you are not stating that you did.

MR. OLDHAM: There was an incident at our firm about the time of her separation. It was not a – it was not a congenial separation. And, yes, there were – I confronted her with various issues – but it was – I felt some sympathy towards her. I'm not going to say that I – I didn't – I didn't fire her in haste, or anger. I was sympathetic to what was going on with her personally.

### The Exhibits Provided by Mr. Oldham.

During the hearing, the Court specifically asked Mr. Oldham whether he had any

evidence other than his own testimony to offer on his behalf:

THE COURT: Are you going to put your files in evidence? Do you have anything other than your testimony to put into evidence? So far all I've heard is that you do have something in your file that showed that there were some insurance claims.

MR. OLDHAM: I do have that, Your Honor.
. . .

THE COURT: Well, I'll give you time –

MR. OLDHAM: [I]f the Court would find that beneficial for some purposes, I would – certainly, I would enter into evidence the correspondence we have with Wilson & Associates indicating the arrearage amounts and then – with regards to the home – and then, of course, the insurance documentation.

THE COURT: Okay. I am not advising you what to put into evidence. But if there was something you wanted to put into evidence, I suggest you introduce it at this time.

MR. OLDHAM: I would do that then, Your Honor. I would introduce the statement from Wilson & Associates, dated May 11, 2009, which is a reinstatement form that was provided to our firm with regards to the notice of deficiency and foreclosure. I would also introduce, Your Honor, a copy of the

16

parcel card for the subject property, showing the assessed value of the property, as well as it has a indication of the dates of the transfers and the foreclosure on it. And then, finally, the documents with regards to the cancellation of insurance on the subject property that were dated June the 4th of 2009.

THE COURT: Okay. So that is what you're putting into evidence?

MR. OLDHAM: Yes, ma'am.

Mr. Oldham presented the Court with two of the documents he mentioned in his testimony. The first was a copy of a letter from Wilson & Associates, dated March 11, 2009, that the Debtors had provided to the Oldham Law Firm during the initial consultation. This letter provided a breakdown of the arrearage, fees and costs on the mortgage. According to this document, the total amount required by Everhome in order to reinstate the mortgage was $8,429.39. This total deficiency amount breaks down into $6,398.16 in arrearage payments, $285.87 in late fees, and $1,745.36 in foreclosure fees and costs. The second exhibit presented by Mr. Oldham was a log detailing the history of property ownership transactions on the Debtors' home. According to this exhibit, the Debtors purchased their home in 2002 for $116,000. The home was transferred to Everhome through the foreclosure sale on May 5, 2009. On February 26, 2010, the property was transferred over to the Department of Housing and Urban Development, and on June 25, 2010, the property was sold to a new owner. Mr. Oldham did not provide the Court with any documentation of correspondence from the Debtors' insurance company or insurance claims filed on the home.

## The Correspondence Between the Debtors and Mr. Oldham.

On August 9, 2010, the Debtors sent a handwritten letter (U.S. Trustee Ex. #6, p.2) to Mr. Oldham requesting a refund of the $800 they paid him to represent them in the bankruptcy case. Within that letter, the Debtors also requested that Mr. Oldham pay them $38,000[11] as compensation for the equity they lost in their home.

On August 17, 2010, Mr. Oldham sent the Debtors a return correspondence (U.S. Trustee Ex. #6, p.3). In his response, Mr. Oldham refused the Debtors' request for a refund. In the letter, Mr. Oldham stated that:

> Of the $800.00 paid to our firm, $300.00 was, in turn, paid towards your filing fee ($274.00) and your credit counseling fee ($25.00). In as much, only $500.00 was paid to our firm for services rendered in counseling, preparing, and filing the bankruptcy petition. This amounted to one-fourth (1/4) of the total contracted fees. In light thereof, I believe the same to be fair and reasonable for the services rendered. I am sorry that we disagree on this, but based on a review of the file and the work performed, I remain unpursuaded [*sic*] otherwise.

Mr. Oldham also refused the Debtors' request for compensation of the lost equity in their home. In support of this decision, Mr. Oldham stated that:

> You initially indicated a desire to retain the home, but subsequently changed your minds and directed our office to sign off on a Motion and Order that effectively surrendered your home to your mortgage creditor. At that time you explained that you did not believe that you had any equity in the home and specifically noted deficiencies such as no carpet. In fact, in your signed and sworn petition, you reported negative equity of approximately $2,500.00. You made a conscious decision not to retain the home and related debt. After the

---

[11]   In her testimony, Mrs. Burnett explained that the $38,000 figure was based on the amount they had paid on their mortgage, which provided 100% of the financing for the purchase of their home.

Order was entered, you again changed your mind and indicated a desire to retain the home.

. . .

Mr. & Mrs. Burnett, while I can certainly sympathize with [*sic*] unfortunate financial hardship, I do not believe our firm bears any responsibility for the loss of your home.

On October 29, 2010, the Debtors wrote a letter back to Mr. Oldham in response to his August 17, 2010 letter (U.S. Trustee Ex. #6, p.5).[12]  In that letter, the Debtors repeatedly denied Mr. Oldham's allegations that they had wanted to surrender their home and reiterated that their only purpose in seeking legal representation from Mr. Oldham was to save their home from foreclosure.  The Debtors acknowledged that they had signed a document to "change our bankruptcy," but pointed out that they only agreed to this after being advised to do so by the Oldham Law Firm and after being advised that they would not be able to keep their home.  Further, the Debtors pointed out in this letter that this agreement only took place after the foreclosure sale, after the bankruptcy case was filed, and after the 341(a) meeting.

## FINDINGS OF FACT

Based on the evidence described above, the Court makes the following specific findings of fact:

1.     The Debtors' sole purpose in seeking legal representation from Mr. Oldham was to prevent their home from being sold in a foreclosure sale.

---

[12]  On the same date as their final letter to Mr. Oldham, October 29, 2010, the Debtors sent a letter to the U.S. Trustee, which included a copy of all of their written communications with Mr. Oldham and a brief summary of the correspondence (U.S. Trustee Ex. #6, p.1).

19

2.    The Debtors selected Mr. Oldham as their attorney, at least in part, based on an advertisement Mr. Oldham had placed in a newspaper promoting his bankruptcy practice.

3.    The Debtors had an initial consultation with the Oldham Law Firm on March 25, 2009.

4.    The Debtors did not meet with Mr. Oldham during their initial consultation or at any time prior to the filing of their case.  The Debtors' only substantive interactions with the law firm prior to filing were with Mr. Oldham's paralegals.

5.    During the initial consultation, the Debtors provided Mr. Oldham's paralegal with copies of letters from Wilson & Associates regarding the foreclosure on their home. The Debtors specifically pointed out to Mr. Oldham's paralegal the portion of the foreclosure notice stating that the sale date was set for April 30, 2009.

6.    During the initial consultation, the Debtors informed Mr. Oldham's paralegal of their desire to prevent the foreclosure sale on their home from taking place.  Mr. Oldham knowingly misrepresented the Debtors' intention to retain the home by asserting that the Debtors changed their minds and made a conscious decision to surrender their home in the bankruptcy case.  Any agreement made by the Debtors to surrender their home was made after the foreclosure sale, and was based wholly on advice they received from the Oldham Law Firm that they had no other option.

7.    During the initial consultation, the Debtors informed Mr. Oldham's paralegal that they were holding a $6,000 tax refund in their bank account, and told the paralegal that

20

they desired that the funds be used to repay the deficiency on their mortgage.

8.      The Debtors were current on all of their debts, other than the mortgage debt, at the time of the initial consultation.

9.      The Debtors are both employed and have consistent monthly incomes that exceed their monthly expenses.  Denise Burnett is a registered nurse, and has been for more than 25 years.  Charles Burnett is an over the road truck driver.

10.     The Debtors had sufficient income to continue paying their ongoing monthly mortgage payment and to pay any deficiency on their mortgage through a bankruptcy plan.

11.     Mr. Oldham failed to provide the Debtors with legal advice under circumstances that warranted such advice.

12.     The Debtors were provided legal advice by Mr. Oldham's paralegal, Ms. Julia Gray.  Mr. Oldham's paralegal advised the Debtors that the only option they had to save their home from foreclosure was to file a Chapter 13 bankruptcy, that they should remove the $6,000 tax refund from their account prior to filing, and that they should stop making their vehicle payments.

13.     The Debtors reasonably relied on the advice they received from Mr. Oldham's paralegal and agreed to file bankruptcy, stop making the payment on their vehicle note, and spend the $6,000 tax refund prior to filing.

14.     The Debtors used a portion of the $6,000 for a trip to see Mrs. Burnett's brother, and gifted the remaining amount to the Debtors' two daughters.  The Debtors did not

list the gifts on their Statement of Financial Affairs. However, this failure was not an intentional misrepresentation by the Debtors, but instead is attributable to the inadequate advice they received from the Oldham Law Firm and their reasonable reliance on that advice.

15.    Within one week of the initial consultation, Mr. Oldham had received everything he had requested from the Debtors in order to file their bankruptcy case. The Debtors' initial consultation was on March 25, 2009. The Debtors paid the amount requested by Mr. Oldham within a day of the initial consultation. The Debtors provided the firm with all of the requested information and documentation within a week of the initial consultation. After receiving all of the required documents and payments, Mr. Oldham had approximately a month to prepare and file the Debtors' case before the date set for the foreclosure sale.

16.    Of the total $800 in payments to the Oldham Law Firm, $274 was used to pay the Debtors' filing fee, and $25 was used to pay for the Debtors' credit counseling fee.

17.    The Debtors made reasonable and diligent efforts to monitor the progress of their case. The Debtors made numerous calls to Mr. Oldham's office that were not returned. A few weeks prior to the foreclosure sale, Mrs. Burnett made an appointment with the firm in order to check on the status of their case. At that appointment, Mr. Oldham's paralegal advised Mrs. Burnett that everything was fine.

18.    In early May, the Debtors received a letter from Wilson & Associates advising them that their home had been sold at the April 30, 2009 foreclosure sale. After receiving this letter, Mrs. Burnett went to Mr. Oldham's office and confronted Mr. Oldham. While

crying and visibly upset, Mrs. Burnett told Mr. Oldham that she was his client and explained to him that their home had been sold in a foreclosure sale. At that time, Mr. Oldham directed Mrs. Burnett to speak with his paralegal. Despite seeing his client upset and crying over the loss of her home, Mr. Oldham took no action until the date of the Debtors 341(a) meeting.

19.     The Debtors' bankruptcy case was filed on May 14, 2009.

20.     On June 9, 2009, Everhome filed a Motion for Relief and Objection to Confirmation. The filings stated that the Debtors' home had been sold in the April 30, 2009 foreclosure sale, the Debtors' interest in the property was terminated at that time, the property was not property of the estate, and that it was requesting relief so that it could enforce its right to possession of the property. Mr. Oldham received notice of those filings prior to his meeting with the Debtors on June 18, 2009.

21.     A hearing on the Motion for Relief was set for June 25, 2009.

22.     The first time the Debtors were given an opportunity to meet with Mr. Oldham was on June 18, 2009, the date of their 341(a) meeting. At the time of that meeting Mr. Oldham knew of the foreclosure sale on the Debtors' home, but did not discuss the consequences of the foreclosure sale with them or suggest any course of action to protect their interests. Instead, Mr. Oldham only told his clients that their file needed some work.

23.     Following his June 18, 2009 meeting with the Debtors, Mr. Oldham turned the management and resolution of the issues in the Burnetts' case back over to his paralegals.

24.     Approximately one week after the June 18, 2009 meeting with Mr. Oldham,

the Debtors were contacted to come into the office for another meeting. Mr. Oldham's paralegal conducted this meeting. Mr. Oldham was not present. During this meeting, the Debtors were informed for the first time that they would not be able to keep their home.

25.     Mr. Oldham consented to the Motion for Relief filed by Everhome. The Court was notified of this agreement on June 24, 2009 by Everhome's attorney. Everhome sent Mr. Oldham a proposed order for his signature. Mr. Oldham did not object to the proposed order. The Court granted Everhome relief on the basis of the parties' agreement.

26.     On July 3, 2009, the Debtors met with the law firm of Crawley & DeLoache in an effort to obtain new counsel for their bankruptcy case.

27.     On July 13, 2009, Crawley & DeLoache filed a response to the Motion for Relief, but their arguments were never heard because Mr. Oldham's office had agreed to the Motion for Relief and had failed to make any objections to the proposed order on the agreement.

28.     Mr. Oldham withheld documents from the Burnetts' file. On July 3, 2009, the Debtors requested a copy of their file from the Oldham Law Firm, but were told that the office did not have time to copy the file because they were closing early for the holiday weekend. When the Debtors returned to the Oldham Law Firm the following Monday, they were provided only a few of the documents from their file and the documents that the Debtors had given the firm with regard to the foreclosure sale had been removed from the file. Mrs. Burnett personally asked Mr. Oldham where these documents were. In response,

24

Mr. Oldham simply told her that he had no knowledge of the documents and then left the room.

29.     Mr. Oldham was aware of his error in failing to timely file the Debtors' case when he met with them on June 18, 2009.

30.     The Debtors were evicted from their home and had to move into an RV park in a borrowed camper-trailer.  The Debtors have been required to move several times since being evicted in order to find a rental home that suited their needs.

31.     In a letter dated August 9, 2010, the Debtors requested that Mr. Oldham refund the amounts they had paid him in attorney fees and requested that he reimburse them for the equity they had lost in their home.

32.     On August 17, 2010, Mr. Oldham responded that the work he had performed justified the compensation he had received in the case, and refused to refund any of the fee. Mr. Oldham also stated in the August 17, 2010 letter that it was the Debtors' decision not to retain the home and that he bore no responsibility for the loss of the home.

33.     Mr. Oldham's testimony was evasive and contradictory.  Mr. Oldham stated in his testimony that he was responsible for the loss of the Debtors' home, but subsequently denied responsibility for this loss by asserting that the Debtors had made a conscious decision to surrender the home.  When asked whether Ms. Gray was removed from her position with the firm as a result of the events in this case, Mr. Oldham first replied that she was, and then immediately contradicted himself by stating that she was removed due to personal issues she

was facing at the time, and then subsequently rehired as a receptionist. When the Court tried again to get a clear answer, Mr. Oldham again evaded the question by stating that it was not a congenial separation, that he had confronted her with various issues, and that he felt sympathy for her and did not fire her in haste.

## DISCUSSION

### I. DISGORGEMENT OF FEES

The Bankruptcy Code provides express authority for the bankruptcy courts to disregard an agreement between a debtor and his attorney with regard to compensation. 11 U.S.C. § 329(b). Similarly, the same provision allows the court to order that an attorney disgorge any amount of compensation already received under the agreement. 11 U.S.C. § 329(b). In determining whether the agreement should be disregarded, or the fees paid disgorged, the court must make a comparison of the fees paid, or expected to be paid, with the services provided, or expected to be provided. *Id.*; *In re Clark*, 223 F.3d 859, 863 (8th Cir. 2000) ("The bankruptcy court has the broad power and discretion to award or deny attorney fees, and, indeed, a duty to examine them for reasonableness."); *In re Redding*, 247 B.R. 474, 478 (B.A.P. 8th Cir. 2000) ("The plain language of § 329 provides that there must first be a determination that the fees are excessive."); *In re Bost,* 341 B.R. 666, 689 (Bankr. E.D. Ark. 2006).

Federal Rule of Bankruptcy Procedure 2017 provides the procedural mechanism by which fee agreements are to be brought before the Court for review:

> On motion by any party in interest or on the court's own initiative, the court after notice and a hearing may determine whether any payment of money or any transfer of property by the debtor, made directly or indirectly in contemplation of the filing of a petition under the Code by or against the debtor or before entry of the order for relief in an involuntary case, to an attorney for services rendered or to be rendered is excessive.

Fed. R. Bankr. P. 2017(a).  The burden to prove that the compensation was a reasonable amount rests on the attorney.  *In re West*, 398 B.R. 629, 647 (Bankr. E.D. Ark. 2009).

## II.   IMPOSITION OF SANCTIONS

The bankruptcy courts have broad authority, under Federal Rule of Bankruptcy Procedure 9011, 11 U.S.C. § 105(a), and their inherent authority, to sanction the persons appearing before them. Fed. R. Bankr. P. 9011; 11 U.S.C. § 105(a);  *In re Clark,* 223 F.3d 859, 864 (8th Cir. 2000); *In re Brown,* 152 B.R. 563, 567 (Bankr. E.D. Ark. 1993).  As set out in this Court's local rules:

> [T]he Court shall have such authority and discretion as are permitted by and under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, statutory and common law, and the express and inherent powers conferred upon them. Sanctions may include suspension or disbarment from the practice before this Court.

Local Rule 2090-2 (adopted January 12, 2006).

Pursuant to Federal Rule of Bankruptcy Procedure 9011, by presenting a document to the court an attorney represents that he has made a reasonable inquiry to ensure that

> (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; (2) the claims, defenses, and other legal contentions therein are warranted by existing

27

law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

Fed. R. Bankr. P. 9011(b). Sanctions entered pursuant to Rule 9011 may be monetary or nonmonetary in form. Fed. R. Bankr. P. 9011(c). However, the level of sanction must be limited to that required to deter misconduct, and cannot be used as a means of compensating the harmed party. *Id.; see also Kirk Capital Corp. v. Bailey*, 16 F.3d 1485, 1489 (8th Cir. 1994); *In re Brown,* 152 B.R. 563, 568-69 (Bankr. E.D. Ark. 1993) ("In determining an appropriate sanction, the court looks to fashioning a narrowly tailored solution which will achieve the specific purposes of the rule . . .").

Section 105(a) provides, in part, that the bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title [and] . . . no provision . . . shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105(a).

Additionally, the bankruptcy courts have an inherent authority to sanction those appearing before them. *See Brown*, 152 B.R. at 567. This power is broad in scope, and includes the power to impose monetary sanctions, as well as to "control admission to its bar and to discipline attorneys who appear before it." *Chambers v. NASCO, Inc.*, 501 U.S. 32,

28

43, 11 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991).  *See also Plaintiffs' Baycol Steering Comm.*

*v. Bayer Corp.*, 419 F.3d 794, 802 (8th Cir. 2005); *Harlan v. Lewis*, 982 F.3d 1255, 1259 (8th

Cir. 1993).  However, because of the potency of the court's inherent powers, great restraint

and discretion is necessary when fashioning a sanction under those powers.  *Harlan*, 982

F.3d at 1262;  *Chambers*, 501 U.S. at 44-45.

### III.   ANALYSIS

The representation provided by the Oldham Law Firm was inadequate to a degree that

rendered the legal services provided valueless, and the harmful actions demand that the Court

enter sanctions against Mr. Oldham.  Mr. Oldham acknowledged the deficiencies in his

representation in his testimony when he stated: "I don't think our firm provided the best

counsel possible.  I don't think that we provided the counsel that they deserved and that they

thought they were getting."

### MR. OLDHAM CAUSED THE DEBTORS TO LOSE THEIR HOME.

Mr. Oldham caused the Debtors to lose their home by failing to provide them with the

legal representation they had paid him for and that he agreed to provide.  The deficiencies

in Mr. Oldham's representation are evidenced by the fact that the Burnetts' singular purpose

in seeking legal representation was to save their home from foreclosure.  During their initial

consultation with the Oldham Law Firm on March 25, 2009, the Debtors provided the law

firm with a copy of a foreclosure notice they had received from Everhome.  That notice

stated in bold type, "**[t]he Property is scheduled to be sold at a foreclosure sale**," and

"**YOU MAY LOSE YOUR PROPERTY IF YOU DO NOT TAKE IMMEDIATE ACTION.**"  The notice explained that the sale was to take place on April 30, 2009, and Mrs. Burnett pointed out the sale date to Mr. Oldham's paralegal, whom he had entrusted to conduct the consultation.  Within one day of the initial consultation, the Debtors paid the fees and costs requested by Mr. Oldham, and within one week of the initial consultation, they had provided all of the requested documentation.  With nearly an entire month remaining before the foreclosure sale was to take place, Mr. Oldham had everything from the Debtors that he needed in order to get their bankruptcy case filed and prevent the foreclosure sale.[13]  Yet, the Debtors' bankruptcy case was not filed until May 14, 2009, after their home had been sold in the foreclosure sale.  Mr. Oldham offered no evidence to justify failing to get the case filed prior to the sale, and acknowledged his responsibility for this failure.  In his testimony Mr. Oldham stated, "nonetheless, we were aware that they were in a foreclosure situation – our firm was aware that they were in a foreclosure situation, and we did not timely file a bankruptcy, Chapter 13, in order to stay the foreclosure proceeding.  And no doubt that we possibly have some – or have some responsibility for that."

---

[13]  The Court notes that even if the Debtors had been unable to provide this information in such an expedient manner, or if there was insufficient time to prepare the documents prior to the foreclosure sale, the bankruptcy system allows for the filing of a skeletal petition that would have prevented the foreclosure sale from taking place and allowed for extra time to prepare the required documents.

## <u>MR. OLDHAM FAILED TO PROVIDE HIS CLIENTS WITH LEGAL ADVICE.</u>

The Debtors went to the Oldham Law Firm to seek legal advice on how to save their home from a pending foreclosure. Prior to their initial consultation, the Debtors had not made a determination that filing bankruptcy was the best action they could take to save their home. In fact, Mrs. Burnett testified that if Mr. Oldham could have helped them to work out a payment agreement directly with Everhome, they would not have filed bankruptcy. Thus, the determination of the appropriate course of conduct was the purpose of the Debtors' visit to the law firm. Yet, the Debtors were never given an opportunity to obtain legal advice from Mr. Oldham. The first opportunity the Debtors were given to meet with Mr. Oldham was on the day of their 341(a) meeting, June 18, 2009, more than a month after their case was filed. Mr. Oldham did not present any evidence to explain why he had never met with his clients prior to the filing of their case, or why he had not been involved in the decision for them to file bankruptcy.

Moreover, it is not clear from the facts of this case that the Debtors' only option to save their home was to file bankruptcy. The Debtors are both employed. Mrs. Burnett is a registered nurse, and has been for more than 25 years. Mr. Burnett is an over the road truck driver. The Debtors' net monthly income consistently exceeds their monthly expenses, and other than their mortgage, all of the Debtors' debts were current as of the date of the initial consultation. Additionally, at the time of the initial consultation, the Debtors were holding a $6,000 tax refund in their bank account, and Mrs. Burnett testified that they wanted to

31

apply all of those funds to the deficiency on their mortgage.  In contrast, the amount owed to Everhome at the time the Debtors sought Mr. Oldham's advice was $6,398.16 in arrearage payments, $285.87 in late fees, and $1,745.36 in foreclosure fees and costs.  Thus, if Mr. Oldham could have negotiated with Everhome to allow the Debtors to apply the $6,000 tax refund to the deficiency, the Debtors only would have owed Everhome $2,429.39, the majority of which was made up of fees and costs.  While the Court cannot speculate as to whether Mr. Oldham might have been successful in an attempt to negotiate a repayment agreement with Everhome, it is sufficient for a finding of inadequate representation that filing for bankruptcy was the only option the Debtors were presented with, and no attempt to negotiate a repayment agreement was made.[14]

### MR. OLDHAM POSITIONED AND ENABLED HIS PARALEGALS TO PRACTICE LAW.

Instead of providing the Debtors with legal advice himself, Mr. Oldham positioned and enabled his paralegals to practice law without a license.  During the initial consultation, Mr. Oldham's paralegal advised the Debtors that the only way to save their home from foreclosure was to file for bankruptcy, that they should temporarily stop making the payments on their vehicle, and that they should remove the $6,000 tax refund from their bank account

---

[14] The Court notes that Mr. Oldham testified that he had attempted to negotiate with Everhome on the Burnetts' behalf.  However, his testimony was that this negotiation attempt was initiated on May 15, 2009.  This was after the foreclosure sale had taken place and after the Debtors' bankruptcy case had been filed, making any such attempt of little or no value to his clients.  Moreover, Mr. Oldham stated in his testimony that he had a copy of the correspondence he sent to Everhome, but failed to present the Court with that letter, which left the Court with concerns as to the validity of his assertions.

prior to filing.  The Debtors followed this advice.  The Debtors agreed to file the bankruptcy, stopped making their vehicle payment, and spent the $6,000 tax refund on a trip to visit Mrs. Burnett's brother and on gifts to their two daughters.[15]  The determination of the appropriate course of legal action should have been subject to oversight and discretion by Mr. Oldham. Mr. Oldham enabled his paralegals to practice law without a license by failing to review the Debtors' case before legal determinations were made as to how to proceed.  Mr. Oldham placed his paralegals in a position to take such actions by allowing the paralegals to conduct the consultation without ever so much as meeting the clients himself, and by continuously referring the Debtors to his paralegals in situations that begged for the attention of an attorney.  The only evidence Mr. Oldham provided to contrast this point was his testimony that he had no knowledge of the $6,000 tax refund prior to these proceedings.  However, Mr. Oldham did not dispute that the Debtors told his paralegal about the funds, or that they were advised by her to remove the funds from their account prior to filing.

### SYSTEMIC DEFICIENCIES IN MR. OLDHAM'S PRACTICE HARMED HIS CLIENTS.

The deficiencies noted in Mr. Oldham's representation were not singular occurrences, but were the result of systemic inadequacies in his practice.  Evidence of these systemic deficiencies are recognizable in Mr. Oldham's file management and employee supervision.

---

[15]  While the Court recognizes that the Debtors should have listed any gifts made in this time period on their Statement of Financial Affairs, the Court finds that this omission was made in reliance on the inadequate advice they received from the Oldham Law Firm.  Furthermore, the Court notes that the focus of this inquiry is on Mr. Oldham's actions, not the actions of the Debtors.

The fact that the case was not filed prior to the foreclosure sale is evidence that Mr. Oldham's file management system was inadequate. Support is also drawn for this conclusion from Mrs. Burnett's testimony that during a visit to the firm to check on the status of her case, Mr. Oldham's paralegal attempted to advise Mrs. Burnett based on the contents of another client's file. Similarly, when Mrs. Burnett attempted to obtain a copy of her file she was only provided a few documents, and none of the foreclosure documents that she had provided to the firm were returned to her. Additionally, Mr. Oldham's employees failed to return numerous calls from the Debtors, and when the Debtors took the initiative to come into the office in person, they were advised that everything with their file was fine. Mr. Oldham failed to provide the Court with any evidence that he has addressed these systemic deficiencies in his practice. He provided no evidence of his calendaring system, no evidence of any file management system, and no evidence of any policy employed by his office to ensure that clients are informed about the progress of their cases.

### MR. OLDHAM NEVER ACCEPTED THE RESPONSIBILITY OF PROTECTING HIS CLIENTS.

Responsibility for the inadequate representation the Debtors received from the Oldham Law Firm cannot be placed on Mr. Oldham's employees. Purely as a matter of his role as the attorney in this case, Mr. Oldham bears responsibility for the actions of his employees. But even more directly, Mr. Oldham bears responsibility in this case because he was repeatedly placed on notice of the issues in the case and failed to take any action to protect his clients' interests. For instance, when Mrs. Burnett received the notice that the

Debtors' home had been sold, she immediately went to Mr. Oldham's office and confronted him with that information.  In that instance, his client, who informed him that she was his client, came into his office crying, and complained to him that the bank had sold their home in the foreclosure sale and that they were being evicted.  This interaction should have caused Mr. Oldham to make himself aware of the circumstances surrounding the foreclosure sale and discover his error in failing to file the bankruptcy case prior to the foreclosure sale. Instead, Mr. Oldham directed his clients into the hands of his paralegal and did not speak with them again until the morning of their 341(a) meeting, more than a month later.  Mr. Oldham was once again made aware of the problems in this case by the Motion for Relief and Objection to Confirmation filed by Everhome on June 9, 2009.  In those filings, Everhome stated that the Debtors' home had been sold on April 30, 2009, prior to the filing of the bankruptcy petition, and that the Debtors' interest in the property was terminated at that time. Mr. Oldham had notice of these filings prior to the June 18, 2009 meeting with his clients and should have been aware that the Debtors had hired him to prevent that very foreclosure.  Yet, Mr. Oldham simply informed the Debtors that their file needed some work and once again left the management and resolution of these issues to his paralegals.

## MR. OLDHAM ACTED AFFIRMATIVELY TO CONCEAL HIS ERRORS.

Mr. Oldham's failure to take action in this case alone would justify the issuance of sanctions against him.  However, Mr. Oldham's abusive conduct extends well beyond the actions that he failed to take, and resonates loudest in his own affirmative acts.  The Court

35

is convinced that Mr. Oldham acted deliberately and purposefully to conceal the inadequacies of the legal representation he provided to the Burnetts in an attempt to shield himself from liability. In the course of that concealment, Mr. Oldham subjected the Debtors and this Court to misleading statements regarding the Debtors' desire to surrender their home. This conclusion was derived from the following observations.

On August 9, 2010, the Debtors wrote a letter to Mr. Oldham requesting that he refund the $800 they had paid to him, and that he pay them $38,000 as compensation for the equity they had lost in their home. On August 17, 2010, Mr. Oldham replied to the Debtors' letter. In his response, Mr. Oldham stated that the Debtors had directed him to surrender the home to Everhome, and that this was a "conscious decision" on their part not to retain the home. In his testimony, Mr. Oldham stated that he "specifically and vividly" recalled having this conversation with the Debtors.

There are multiple problems with Mr. Oldham's stated defense, not the least of which is that it provides no defense to Mr. Oldham for failing to file the Debtors' bankruptcy case prior to the foreclosure sale. Mr. Oldham's August 17, 2010 letter makes clear that the conversation he claims to have had with the Debtors in which they made a conscious decision to surrender the home was in relation to the Motion for Relief filed by Everhome. That Motion for Relief was not filed until June 9, 2009. The foreclosure sale, on the other hand, took place on April 30, 2009. As a result, even if the Court were to accept Mr. Oldham's defense that the Debtors wanted to surrender the property, this would not absolve Mr.

36

Oldham of liability for failing to file the case in a timely manner because, by Mr. Oldham's own account, the Debtors' decision to surrender the property occurred after the foreclosure sale. This point is hardly worth making, however, because the Court finds that the Debtors did not have a desire to surrender their home to Everhome.

There is no evidence that the Debtors ever desired to surrender their home. Mrs. Burnett testified that the Debtors' sole purpose in seeking legal representation was to save their home from foreclosure. In the Debtors' October 29, 2010 letter to Mr. Oldham, the Debtors stated that "[t]he *only* reason we made an appointment and came to Oldham Law Firm was [to seek] legal help and advice to save our home from foreclosure."

On the other hand, the tone, and in large part the substance, of Mr. Oldham's testimony was contradictory. In his August 17, 2010 letter, Mr. Oldham informed the Debtors that "I do not believe our firm bears any responsibility for the loss of your home." Yet, in his testimony, one of the first statements made by Mr. Oldham acknowledged his responsibility for failing to file the Debtors case prior to the foreclosure sale. Similarly, several of Mr. Oldham's responses to questions from the Court were evasive and vague. For instance, when the Court asked Mr. Oldham whether he terminated his paralegal's employment because of the errors in this case, Mr. Oldham responded that he had, but then immediately followed that assertion with statements that her termination was based on her personal issues, that he had subsequently rehired her as a receptionist, and that he did not fire her in haste. A second example comes from Mr. Oldham's assertions during the hearing on

37

these matters that he had documents in his file that supported his testimony, but that he never presented to the Court.

As a result, the Court was not able to rely on Mr. Oldham's testimony as credible, but did find Mrs. Burnett's account of the circumstances to be credible and reliable. The Court finds that the Debtors did not express a desire to surrender their property to Mr. Oldham, and finds Mr. Oldham's assertion to the contrary to be misleading and untrue. While the Court is aware of the possibility that the Debtors may have agreed to surrender the home at some point after being informed by Mr. Oldham's paralegal that they could not keep the home, such a decision can only be appropriately described as a reluctant acquiesce to the assurances made to the Debtors that no other alternative existed. The Court will not allow the Debtors' acquiescence to the harm done to them by Mr. Oldham's office to be twisted and stretched into an expression of the Debtors' desires.

Additionally, Mr. Oldham refused to provide the Debtors with a copy of their file. The firm refused to make the Debtors a copy of their file on July 3, 2009, because they were closing early for the holiday weekend. This refusal was harmful to the Debtors, especially given the importance of time if the Debtors were to have any chance of saving their home. Further, when the Debtors were finally provided a copy of the file, they were only provided a few pages from the file and the letters they had provided to the firm regarding the foreclosure and sale were not returned to them. When Mrs. Burnett asked Mr. Oldham where the foreclosure documentation was, his response was, "I don't know, I don't have any

knowledge of that."   Yet, Mr. Oldham was able to present the Court with one of those documents on his own behalf during the hearing.  The Court finds that Mr. Oldham's action in failing to return these documents was an attempt to shield himself from liability.

### MR. OLDHAM FAILED TO PROVIDE ANY EVIDENCE IN DEFENSE OF HIS ACTIONS.

Mr. Oldham's lack of preparation for, and meager presentation during, the hearing on the Order to Show Cause exemplified an indifference to and lack of respect for the judicial process, and provides evidence that Mr. Oldham remains unaware of the significant harm he has caused the Debtors in this case.  Mr. Oldham was made aware of the allegations against him well in advance of the hearing on this matter.  The Debtors wrote Mr. Oldham letters on August 9, 2010, and October 29, 2010, which accused Mr. Oldham of failing to provide adequate representation, failing to timely file their bankruptcy case in order to prevent the foreclosure sale, and misrepresenting the circumstances surrounding the loss of their home. On August 23, 2010, the U.S. Trustee filed the Motion to Disgorge Fees, which also referenced the inadequacies of the representation provided by Mr. Oldham, and stated concerns that Mr. Oldham's actions violated the Bankruptcy Code and Rules.   These allegations were also adopted in the Court's Order to Show Cause entered against Mr. Oldham on September 28, 2010.  A hearing on the Order to Show Cause was originally scheduled for December 2, 2010, but was rescheduled for January 6, 2011 at Mr. Oldham's request.  Further, the Order to Show Cause specifically encouraged him to "appear before this Court fully prepared to present all evidence, of whatsoever nature, that he deems

39

necessary and appropriate for the Court's consideration."

Yet, during the hearing, Mr. Oldham offered no evidence other than his own testimony and two exhibits.  Further, the two documents submitted as evidence were in no way beneficial to his case – the first being a reinstatement computation from Wilson & Associates, dated March 11, 2009, that the Debtors had given the Oldham Law Firm during their initial consultation, and the second being a log detailing the history of property ownership of the Debtors' home.  Although Mr. Oldham repeatedly referenced other documents in his file, he failed to present those documents.  Specifically, Mr. Oldham failed to produce the insurance documentation that he claimed was the basis for the Debtors' desire to surrender their home, and the letter to Wilson & Associates that he claimed to have sent in order to arrange a repayment agreement with Everhome.

The purpose of this hearing was to allow Mr. Oldham an opportunity to show cause why he should not be sanctioned for the conduct alleged against him.  Mr. Oldham had notice of the allegations against him and had ample time to prepare his case.  Yet, the only evidence Mr. Oldham presented in his defense was his own testimony, which the Court finds to be unreliable, and two exhibits, which the Court finds to be of no redeeming value to him.  Put simply, Mr. Oldham's failure to present the Court with evidence that he did not commit the errors charged against him provides further support for a conclusion that he did.

## CONCLUSION

The Debtors went to the Oldham Law Firm and agreed to file bankruptcy for one purpose – to save their home. Had the legal representation the Debtors received from Mr. Oldham met even the most minimal requirements of professional responsibility, there is no doubt they could still be living in their home today. Instead, Mr. Oldham failed to provide the Debtors with legal advice, failed to explore any legal options outside of bankruptcy, failed to timely file his client's bankruptcy petition in order to prevent the foreclosure sale of their home, positioned and enabled his paralegals to practice law, and failed to take any action after the sale to attempt to mitigate the harm. Mr. Oldham is solely to blame for these failings. Further, Mr. Oldham attempted to shield himself from liability by refusing to return documents to the Debtors from their file, and by making misleading statements to the Debtors and this Court about the circumstances resulting in the loss of the home. While the Court recognizes Mr. Oldham's aptitude as an effective trial attorney, the foundation of our legal system relies on an attorney's commitment to the truth. Mr. Oldham has not honored that commitment in this case, and the Court cannot allow that failing to be inflicted upon other innocent persons who would place their trust in him to represent them in a bankruptcy case. The Court finds that Mr. Oldham's conduct requires an entry of sanctions against him as set forth on the Court's orders below.

The Debtors paid the Oldham Law Firm a total of $800. Of the total $800 received by the Oldham Law Firm, $274 was spent on the bankruptcy filing fee, $100 was paid for the

Debtors' credit counseling fee.  The remaining $526 is attributable to Mr. Oldham's attorney fees.  The Court finds that the $526 paid to the Oldham Law Firm in this case was unreasonable and excessive compensation in light of the legal services provided.  Therefore, the Oldham Law Firm is ordered to disgorge the entire $526 it received in attorney fees and is to receive no other compensation under its agreement with the Debtors.

For the reasons stated herein, it is hereby

**ORDERED** that the Trustee's Motion to Disgorge Fees is granted.  Mr. Oldham is ordered to refund attorney fees in the amount of $526 to the Debtors within **fourteen (14) days** of the entry of this Order; it is further

**ORDERED** that Mr. Oldham shall file a certificate of compliance with this Court within **fourteen (14) days** of entry of this Order, averring that the fees have been turned over to the Debtors.  Failure to timely pay the fees and file the certificate may be grounds for contempt; it is further

**ORDERED** that this Opinion will be forwarded to the Arkansas Supreme Court's Committee on Professional Conduct as a complaint against Mr. Oldham; it is further

**ORDERED** that Mr. Oldham is suspended from appearing before, or filing pleadings and other documents in the United States Bankruptcy Courts, until such time that the Arkansas Supreme Court's Committee on Professional Conduct has reviewed this matter and made its determination.  This suspension shall take effect immediately, except Mr. Oldham

42

shall be allowed a period of **fourteen (14) days** from the entry of this Order to make arrangements for the continued protection of his client's interests.

     **IT IS SO ORDERED.**

                                                   _Audrey R. Evans_
                                                   Audrey R. Evans
                                                   United States Bankruptcy Judge
                                                 Dated:   04/15/2011

cc:    Charles & Denise Burnett, Debtors

        Chad R. Oldham

        Mike DeLoache, Attorney for Debtors

        Mark T. McCarty, Chapter 13 Trustee

        United States Trusee

        Clerk of Court